Estate of F. Russell Campbell, Deceased, Mary Baird Campbell, Executrix, and Mary Baird Campbell v. Commissioner. Tennessee Valley Associates, Inc. v. Commissioner.
Estate of Campbell v. Commissioner
Docket Nos. 94599, 94600.
United States Tax Court
T.C. Memo 1964-83; 1964 Tax Ct. Memo LEXIS 248; 23 T.C.M. (CCH) 508; T.C.M. (RIA) 64083; March 31, 1964
William Waller and Andrew Ewing, 718 Nashville Bank & Trust Bldg., Nashville, Tenn., for the petitioners. J. Larry Broyles, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: In these consolidated proceedings respondent determined deficiencies as follows: Docket
Petitioner
No.
Year
Deficiency
Estate of F. Russell
Campbell, Deceased,
Mary Baird Camp-
bell, Executrix, and
Mary Baird Camp-
bell
94599
1958
$ 5,501.10
1959
7,585.00
Tennessee Valley As-
sociates, Inc.
94600
1959
16,838.34
The issues for decision are: 1. Whether the transfer of 37 acres to Tennessee Valley Associates, Inc., was an anticipatory arrangement for the purpose of diverting income to a controlled corporation to reduce the tax liability of the Campbells. 2. Whether the gain realized by Tennessee Valley Associates, Inc., on the 37 acres of land should be reallocated to the Campbells under section 482 of the Internal Revenue Code of 1954. [1]
*250 3. What amount of gain, if any, realized on the sale of a personal residence is nonrecognizable under section 1034 of the 1954 Code. Findings of Fact Some of the facts have been stipulated. The stipulated facts and exhibits are herein incorporated by this reference. F. Russell Campbell and Mary Baird Campbell, husband and wife residing at 1012 Belle Meade Boulevard, Nashville, Tennessee, filed joint Federal income tax returns for the taxable years 1958 and 1959 with the district director of internal revenue at Nashville, Tennessee. F. Russell Campbell, hereinafter referred to as Campbell, subsequently died and Mary Baird Campbell qualified as executrix of her husband's estate. Tennessee Valley Associates, Inc., is a Tennessee corporation maintaining its offices at 1012 Belle Meade Boulevard, Nashville, Tennessee. It filed a Federal income tax return for the taxable year ending January 31, 1959, with the district director of internal revenue at Nashville, Tennessee. Tennessee Valley Associates, Inc., was originally incorporated under the name of Gambill Distributing Company in May 1934 to engage in the general business of a wholesale and retail merchant and distributor, dealing *251 primarily in electrical appliances, fixtures, and apparatus. In March of 1940 Campbell was appointed trustee of Gambill Distributing Company by a Federal court under Chapter X of the Bankruptcy Act. On March 10, 1941, the reorganization of the Gambill Distributing Company was approved by the Federal court. Following the reorganization Campbell became associated with Wheless Gambill in the operation of the business of that corporation, being elected a director thereof on August 15, 1941, and secretary-treasurer of the corporation on June 1, 1942. Campbell continued his active participation in the business until and following the death of Wheless Gambill. On March 25, 1941, the name of the corporation was changed by a charter amendment to Tennessee Valley Associates. On June 6, 1945, Wheless Gambill died and on November 17, 1946, Campbell acquired all the stock of the corporation. He continued to be sole owner of the stock until his death on August 6, 1963. As a part of the same transaction whereby the stock of Tennessee Valley Associates was acquired, Campbell also acquired the stock of an affiliated corporation, Tennessee Valley Marketers, Inc. For a number of years prior to its *252 fiscal year ending January 31, 1955, Tennessee Valley Associates earned substantial profits in the operation of its business of manufacturing and selling electrical and household appliances. Beginning with its fiscal year ending January 31, 1955, taxable losses were sustained as follows: Fiscal Year
Ending January 31,
Amount
1955
$27,899.02
1956
18,154.77
1957
17,639.02
1958
6,492.82 Prior to 1956 Tennessee Valley Associates had largely discontinued its manufacturing activities and in that year had commenced to reduce its inventory. It continued to make purchases of inventory through 1956, but in October of that year disposed of the greater portion of its inventory and physical assets. For many years prior to 1958 Campbell and his wife had resided at Dun Ailie, a country estate of 236.6 acres located on Murfreesboro Road about five miles from the center of the City of Nashville, Tennessee. He acquired this estate partly by inheritance from his father in 1942 and partly by purchase from the other heirs in 1944. The dwelling house, of brick construction, was an ante-bellum residence built in 1848 and was considered one of the more attractive country homes *253 around Nashville. In the main part of the residence there were two floors with four rooms on each floor. There was also a three-story back wing comprised of six rooms. There were two bathrooms when Campbell moved into the house and a third was subsequently added. He modernized the two existing bathrooms and the heating system and made other renovations. There were the usual outbuildings appurtenant to a country home of this period, such as a three-room servants' house, a garage, a brick smokehouse, a masonry milk storage building, and a six-stall horse barn. A dairy barn burned in 1946 at which time dairy operations, which had been conducted by a tenant farmer, were discontinued. The residence at Dun Ailie was located 450 feet from Murfreesboro Road on a plateau 75 to 100 feet from the brow of a bluff which rose some 70 feet above Murfreesboro Road. Murfreesboro Road was not visible from the residence. One access road to Dun Ailie opened on Murfreesboro Road and consisted of a series of horseshoe curves up the bluff culminating in a circular drive-way in front of the house. Another access road led from the end of Winthorne Drive at the side of Dun Ailie and was used by delivery *254 trucks. The Winthorne Drive entrance was preferable to the Murfreesboro Road Driveway during inclement weather. Subsequent to 1946 subdivisions known as the Glencliff and Weaver Subdivisions were constructed which in time surrounded the estate on three sides. By 1957 there were 2,500 homes located within a radius of one and one-half miles of the farm. Sometime prior to 1956, Campbell was approached by Omer Jordan with a plan to develop the estate as a subdivision. Campbell had no interest in a joint venture arrangement for such a development. In 1956 he submitted a preliminary plat for subdivision of 225 acres of the estate to the Davidson County Planning and Zoning Commission. Prospective streets and lots were shown on the plat. It was given preliminary approval sometime prior to June 16, 1956, but this plat expired sometime prior to June 16, 1958, in accordance with the regulations of the Davidson County Planning and Zoning Commission. During the summer of 1956, Albert Morris submitted an application to the Federal Housing Administration requesting approval of the development of the estate as a subdivision. Between that time and June of 1957, Campbell corresponded and conferred *255 several times with officials of the Federal Housing Administration and with various State and local officials concerning the posibilities of subdividing the estate and concerning certain sewerage problems that had arisen. On May 20, 1957, the Federal Housing Administration notified Campbell that the preliminary plat for subdivision which had been accepted by the Davidson County Planning and Zoning Commission was not acceptable to the Federal Housing Administration if septic tanks were used for waste disposal. On receipt of this notification Campbell compiled further data and submitted it with respects on two occasions that his application for acceptance of the preliminary plat for subdivision of the estate be reviewed. Nothing further was done. In the latter part of 1957 Campbell received offers from Kimbrough-Phillips and from Albert Morris in regard to purchase of the estate. The specific amounts of these offers are unknown, but the Kimbrough-Phillips offer was in excess of $1,000 per acre. On January 27, 1958, Campbell caused Tennessee Valley Associates to amend its charter to empower it to acquire, by purchase, lease, or otherwise, lands and interest in lands, and to own, hold, *256 improve, develop, and manage any real estate so acquired for investment purposes only, and to acquire and hold securities of all kinds for investment purposes. At the same time, the name of the corporation was changed to Tennessee Valley Associates, Inc. On January 30, 1958, Campbell, joined by his wife, conveyed to Tennessee Valley Associates, Inc., by warranty deed, 37 acres which was part of the 236.6-acre estate. This deed of conveyance was duly recorded in the register's office for Davidson County, Tennessee, on January 31, 1958. The transaction was entered on the corporation's books as follows: Debit
Credit
Real Estate
$6,512.27
Donated Surplus
$6,512.27 A notation beside this entry reads: "37 acres donated by Russell Campbell, his date of acquisition - 1945." Early in February 1958, Charles Morris and his associates in the Hallmark Construction Company, the Atlas Construction Company, and Hudson & Driver Construction Company began negotiating with Campbell in regard to the sale of the entire 236.6 acres. Bargaining for the sale of the entire tract for a lump sum, they offered $450,000 on February 4, 1958. This was the final sales price agreed to *257 by the parties. After several weeks of negotiations Campbell and his wife and Tennessee Valley Associates, Inc., entered into a contract of sale with Henry H. Hudson and Carson C. Driver, Jr., partners doing business as Hudson & Driver Construction Company, Atlas Construction Company, and Hallmark Construction Company. In the contract of sale the purchase price for the property was allocated by the sellers as follows: (1) $330,000 - for 178.59 acres of land owned by the Campbells. (2) $45,000 - for 5.1 acres of land owned by the Campbells. (3) $75,000 - for 37 acres of land owned by Tennessee Valley Associates, Inc. The contract of sale provided for the payment of the purchase price as follows: $35,000.00 to be paid in cash to Russell Campbell upon delivery of deed conveying title to the tracts of land described in Exhibits A and B; and $15,000.00 to be paid in cash to Tennessee Valley Associates, Inc. upon delivery of deed conveying title to the tract of land described in Exhibit C, said deeds to be in accordance with the provisions of Article 5; provided, however, the said sum of $10,000.00 on deposit with the Escrow Agent shall be paid by the Escrow Agent, and shall be *258 applied as credits on the purchase price of the several tracts as follows: To Russell Campbell, $7,000.00, to Tennessee Valley Associates, Inc. $3,000.00. The balance of the purchase price shall be evidenced by four notes in equal amount, payable on or before one, two, three and four years respectively, after date, without interest, but said notes shall bear interest at the rate of six per centum (6%) per annum from and after their respective dates of maturity. Said notes shall be secured by a vendor's lien and installment deed in usual form. The earnest money payment required by the contract of sale was delivered to the escrow agent, Attorneys Title Company, on April 17, 1958, and the escrow agreement was executed by all parties on that date. On June 16, 1958, the Campbells and Tennessee Valley Associates, Inc., executed deeds of conveyance in accordance with the contract of sale except that there was no separation of the 5.1 acres from the remainder of the tract and no allocation of the sales price for the tracts conveyed by the Campbells. Contemporaneous with the execution of the deeds of conveyance the parties entered into a collateral agreement. In years subsequent to the *259 sale Tennessee Valley Associates, Inc., neither acquired, purchased, or leased other property or securities, nor owned, held, improved, developed, or managed any real estate. Of the original 236.6-acre estate, Campbell retained, for possible future commercial development, a section fronting on Murfreesboro Road for approximately 1500 feet. This retained section was located at the bottom of the bluff between the dwelling house and Murfreesboro Road. The retention of this section blocked the driveway from Murfreesboro Road, making it necessary to reach the dwelling house by using the driveway off of Winthorne Drive. The dwelling house was located approximately 50 to 100 feet from the property retained by Campbell. Sometime prior to March 23, 1957, Tennessee Valley Associates, Inc., had incurred an indebtedness to Tennessee Valley Marketers, Inc., in the amount of $30,000. Sometime prior to September 30, 1957, Tennessee Valley Marketers, Inc., had incurred an indebtedness to Campbell in the amount of $28,000. This indebtedness had been reduced to $13,000 by September 30, 1958. On September 30, 1958, the largest asset of Tennessee Valley Marketers, Inc., was the $30,000 account receivable *260 owed to that corporation by Tennessee Valley Associates, Inc., and the largest single liability of Tennessee Valley Marketers, Inc., was the $13,000 remaining on the note payable to Campbell. Pursuant to the contract of sale, Tennessee Valley Associates, Inc., received $14,628.26 in cash on July 17, 1958. On August 28, 1958, Tennessee Valley Associates, Inc., loaned Campbell $14,000. Campbell repaid $4,000 of this loan on June 23, 1959. On July 13, 1959, the second $15,000 payment required by the contract of sale was made to Tennessee Valley Associates, Inc. On September 28, 1959, Tennessee Valley Associates, Inc., paid $24,543.53 to Tennessee Valley Marketers, Inc., - $4,543.53 representing interest and $20,000 representing principal, reducing to zero the $30,000 indebtedness to the affiliated corporation, $10,000 having been paid prior to that date. On the same day, Tennessee Valley Marketers, Inc., paid $13,000 to Campbell, as payment in full of the balance owed to him by that corporation. And, as part of the same series of transactions, on September 28, 1959, Campbell paid Tennessee Valley Associates, Inc., $10,846.66 - $846.66 representing interest and $10,000 representing principal, *261 reducing to zero the principal of that indebtedness. On February 1, 1958, Tennessee Valley Associates, Inc., had an opening inventory valued at $9,035.96. On January 31, 1959, it had a closing inventory valued at $8,325.96. No inventory was purchased by the corporation during the fiscal year ending January 31, 1959. During the fiscal year the corporation received $773.50 from the sale of inventory; gross profits from these sales amounted to $63.50. During its fiscal year ending January 31, 1959, Tennessee Valley Associates, Inc., incurred the following business expenses: Payroll taxes
$ 33.39
Real Estate taxes
56.74
Tennessee Franchise & Excise Taxes
2,438.52
Telephone & Telegraph
42.74
Legal or professional
752.84
Collection expenses
41.35
Miscellaneous
31.10
Insurance
12.95
Total
$3,409.63 During that same fiscal year the corporation incurred rental expense on a warehouse where the inventory was stored and paid $19.75 in salaries and wages. The only income item of Tennessee Valley Marketers, Inc., during the fiscal year ending September 30, 1959, was the $24,543.53 paid to that corporation by Tennessee Valley Associates, Inc., on September 28, 1959. During *262 the same fiscal year Tennessee Valley Marketers, Inc., made four disbursements: November 23, 1958
$ 6,995.00
March 16, 1959
75.00
June 27, 1959
138.57
September 28, 1959
13,208.57
Total
$20,417.14 The $13,208.57 disbursement was in payment of the loan to Campbell. In their income tax return for 1958 the Campbells elected to treat the gains on the sale of 178.59 acres on the installment basis and reported that the proceeds for the sale of the residence and 5.1 acres were reinvested in a new residence. Petitioner Tennessee Valley Associates, Inc., had a net operating loss carry-over of $70,185.63 available as a deduction in the fiscal year ending January 31, 1959. In such year it reported a gain from the sale of the 37 acres of land in the amount of $67,353.38. For the years 1958 and 1959, the Campbells claimed and were allowed farm losses of $5,112.26 and $5,216.03, respectively, from farm operations at Dun Ailie. Within one year after the sale of Dun Ailie, the Campbells purchased a home at 1012 Belle Meade Boulevard, Nashville, Tennessee, for $70,000. Ultimate Findings 1. The motivating purpose in transferring 37 acres of land to Tennessee Valley *263 Associates, Inc., was to obtain the resulting tax-saving benefits. 2. The adjusted cost or other basis of the residence and 5.1 acres sold by the Campbells in 1958 was $20,554.05 and the allocated sales price for such property was $45,000. Opinion The transactions involving the Campbells' Dun Ailie estate give rise to the issues to be resolved in this proceeding. Approximately two days prior to commencing negotiations which resulted in the sale of their entire estate, the Campbells transferred, as a donation to capital surplus, 37 acres of the estate to Tennessee Valley Associates, Inc., a virtually dormant electrical appliance corporation, wholly owned by Campbell, which had a large operating loss carry forward. Shortly thereafter, the entire estate was sold at a substantial gain. Tennessee Valley Associates, Inc., offset the gain from the 37 acres of land against the operating loss carry forward and reported no taxable gain. For income tax purposes the Campbells divided the remaining acreage into two tracts, reporting that the gain from 5.1 acres of land had been reinvested in another residence and that under section 1034 of the Internal Revenue Code *264 of 1954 no gain should be recognized. The gain on the remaining 178.59 acres of land was reported as a long-term capital gain. Respondent determined that the gain on the 37 acres of land purportedly transferred by Tennessee Valley Associates, Inc., constitutes taxable income to the Campbells. His position is that the transfer of the 37 acres to Tennessee Valley Associates, Inc., was an anticipatory arrangement entered into solely for the purpose of diverting income to a controlled corporation in order to reduce and escape tax liability and that the transfer must be disregarded for purposes of taxation. Petitioners, on the other hand, contend that business purposes other than tax-saving benefits motivated the transfer to the corporation. It should now be clear that transactions, though real and formally perfect, may be disregarded for tax purposes if their real nature or substance is none other than tax minimization. Gregory v. Helvering, 293 U.S. 465 (1935). In viewing the situation realistically for tax purposes, it is proper for us to examine the reasons advanced by petitioners *265 as to why they took the steps they did. Admitting that they were cognizant of the substantial tax benefits that would result "if the 37 acres were sold," petitioners would have us find the primary purposes of the transfer to the corporation to be (a) to strengthen its financial position by increasing its capital assets through means of donated surplus and (b) to enable its sole stockholder, Campbell, who was advancing in age, to direct his energies toward investments in land and securities. Certainly these asserted reasons are proper and understandable on the surface but, exposed to the light of actualities, they can be seen to deteriorate. Within a few weeks after receipt of the initial $15,000 payment required by the sales contract, Tennessee Valley Associates, Inc., loaned or advanced $14,000 to Campbell. Although repaid a year later, this "advance" enabled Campbell to received practically all of the immediate cash benefits realized on the sale of the estate. Upon receipt of the second $15,000 payment in the next year, the corporation utilized the cash in repaying a $24,543.53 loan and interest to its affiliated corporation, Tennessee Valley Marketers, Inc., which in turn repaid *266 a $13,000 loan to Campbell, who then repaid the "advance" received from Tennessee Valley Associates, Inc. Thus, the cash received by the corporation during the first two years following the sale of the 37 acres was used to accomplish inter-corporate and shareholder transactions rather than to carry out the expressed intention to revitalize the "struggling" corporation. Without cash or resources with which to launch out into investments in real estate and securities - the avowed purpose for which the corporate charter was amended - it is not surprising that in subsequent years the corporation neither acquired, purchased, or leased other properties or securities, nor owned, held, improved, developed, or managed any real estate. The only real estate acquired by the corporation following the charter amendment was the 37-acre tract of Dun Ailie which was disposed of shortly thereafter. Even though petitioners insist that there were no negotiations in progress and no present intention to sell Dun Ailie at the time the tract was donated to the corporation, Campbell was well apprised of the saleability of his estate as the result of the several offers he had received and the subdividing *267 that had taken place on all sides of the estate. He could also reasonably apprehend the substantial taxable gain that would be realized on a sale of the estate. While we think it immaterial whether or not Campbell had knowledge of a specific selling opportunity at the time of the transfer, we find it highly coincidental that negotiations resulting in a final sales agreement were commenced two days after the transfer to the corporation. Furthermore, we are persuaded by the following factors: (1) that the evidence shows that the purchasing group was from the beginning bargaining with Campbell for the purchase of the entire estate and was not informed at the outset that a portion of the estate was held by Tennessee Valley Associates, Inc.; (2) that the allocation of the sales price to the three tracts was carried out by petitioners at their request; (3) that before the transfer Tennessee Valley Associates, Inc., had a sizeable unrealized net operating loss and no prospect of realizing income against which it might be offset; (4) that the $67,353.38 gain on the sale of 37 acres reported by the corporation in 1959 closely equalled the $70,185.63 net operating loss deduction available; *268 and (5) that the operating loss deduction having been almost completely utilized, no further effort was made toward legitimate business activity or the acquisition of new property or investments. In the light of these factors it is our view that the asserted business purposes for the challenged transfer fade in the glare of tax motivation. Consequently, we hold that for tax purposes the transfer should be disregarded and the gain on the sale of the 37-acre tract should be taxed to the Campbells. This makes it unnecessary for us to consider respondent's alternative argument that the gain realized by Tennessee Valley Associates, Inc., on the 37 acres should be reallocated to the Campbells under section 482 of the Internal Revenue Code of 1954. The only issue remaining, therefore, is the applicability of section 1034 of the Internal Revenue Code of 1954 in deferring recognition of gain, if any, realized upon the sale of the residence. [2] That section provides generally that gain realized upon the sale of a residence will be recognized only to the extent that the adjusted sales price of the residence exceeds the cost of purchase of *269 a new residence. In the contract of sale and on their Federal income tax returns for 1958 and 1959, the Campbells allocated $45,000 of the sales price for the Dun Ailie estate to the residence and 5.1 acres. Purchasing a new residence for $70,000 within a year, they claimed that the excess gain over the adjusted basis of the old residence should not be recognized under section 1034. Their present position, however, is that the nature of a *270 country estate being what it is, the entire 183.69-acre tract of Dun Ailie retained was used as the residence and therefore that gain to the extent of $70,000, the cost of the new residence, should not be recognized. Respondent argues that the Campbells' residence was comprised of 5.1 acres, citing as authority section 1.1034-1(c)(3)(ii), Income Tax Regs., [3] and that the sales price allocable to that tract and the improvements thereon did not exceed the Campbells' basis. *271 The regulation relied on by respondent provides that an allocation must be made where part of a property is used by the taxpayer as his principal residence and part is used for other purposes. That this is a reasonable interpretation of section 1034 is borne out by the Committee report on the equivalent provision of the 1939 Code (section 112(a)) which stated: Where the taxpayer's residence is part of a property also used for business purposes, as in the case of an apartment over a store building or a home on a farm, and the entire property is sold, the provisions of section 303 will apply only to that part of the property used as a residence, including the environs and outbuildings relating to the dwelling but not to those relating to the business operations. H. Rept. No. 586, 82d Cong., 1st Sess., p. 27 (1951), 1951-2 C.B. 378. The facts in this case show that the Dun Ailie estate was not only a residence, but the site of a farming operation. For the years in issue the Campbells claimed and were allowed farm losses of $5,112.26 and $5,216.03. In 1958 depreciation was taken *272 on farm buildings and equipment located at Dun Ailie. Walking horses were raised and trained and some beef cattle were raised. We find an allocation of acreage to be necessary and have concluded, in accordance with the sales contract and the respondent's determination, that the Campbells' residence was comprised of 5.1 acres and the improvements thereon. Respondent has further determined that the residence and 5.1 acres had a basis to the Campbells of $20,554.05 and that such amount also represents that portion of the total sales price attributable to such property. We think the respondent's determination as to basis must be sustained. He allocated $16,400 for the cost or other basis of the residence, $3,498.33 for improvements to the residence, $563.94 for the cost or other basis of 5.1 acres of land, and $91.78 for the pro rata share of engineering work done on the entire tract in 1956. This determination seems both reasonable and thorough. Moreover, the petitioners' evidence is insufficient to prove otherwise. However, we have concluded that the evidence confirms the correctness of petitioners' original sales price allocation of $45,000 to the residential property. In our *273 opinion the record as a whole substantiates this amount as a reasonable sales price for the 5.1 acres of land and 14-room ante-bellum home, in good repair, with modern conveniences and improvements. There being gain on the sale of the residence as the result of these findings, the provisions of section 1034 are applicable. Decisions will be entered under Rule 50 in both dockets. Footnotes
1. In the statutory notice of deficiency, respondent determined that sec. 269, I.R.C. 1954, prevented petitioner Tennessee Valley Associates, Inc., from offsetting the gain realized on the purported sale of 37 acres of land against a net operating loss carry forward. On brief respondent concedes that sec. 269↩ is inapplicable to the facts at hand.
2. SEC. 1034. SALE OR EXCHANGE OF RESIDENCE. (a) Nonrecognition of Gain. - If property (in this section called "old residence") used by the taxpayer as his principal residence is sold by him after December 31, 1953, and within a period beginning 1 year before the date of such sale and ending 1 year after such date, property (in this section called "new residence") is purchased and used by the taxpayer as his principal residence, gain (if any) from such sale shall be recognized only to the extent that the taxpayer's adjusted sales price (as defined in subsection (b)) of the old residence exceeds the taxpayer's cost of purchasing the new residence.↩
3. Sec. 1.1034-1(c)(3)(ii), Income Tax Regs.
(ii) Where part of a property is used by the taxpayer as his principal residence and part is used for other purposes, an allocation must be made to determine the application of this section. If the old residence is used only partially for residential purposes, only that part of the gain allocable to the residential portion is not to be recognized under this section and only an amount allocable to the selling price of such portion need be invested in the new residence in order to have the gain allocable to such portion not recognized under this section. * * *↩